1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

THE COALITION TO PROTECT PUGET
SOUND HABITAT,

Plaintiff,

v.

U.S. ARMY CORPS. OF ENGINEERS, *et al.*,

Defendants,

and

TAYLOR SHELLFISH COMPANY, INC.,

Intervenor - Defendant.

_____

CENTER FOR FOOD SAFETY,

Plaintiff,

v.

U.S. ARMY CORPS OF ENGINEERS, *et al.*,

Defendants,

and

PACIFIC COAST SHELLFISH GROWERS
ASSOCIATION,

Intervenor - Defendant.

Case No. C16-0950RSL

Case No. 17-1209RSL

ORDER HOLDING NWP 48
UNLAWFUL IN THE STATE OF
WASHINGTON AND
REQUESTING ADDITIONAL
BRIEFING

This matter comes before the Court on cross-motions for summary judgment filed by the

parties and intervenors in the above-captioned matters. Dkt. # 36, # 44, and # 45 in C16-

0950RSL; Dkt. # 31, # 43, and # 44 in C17-1209RSL. The Court has also considered the Swinomish Indian Tribal Community's submission in a related case, C18-0598RSL (Dkt. # 28). Plaintiffs challenge the U.S. Army Corps of Engineers' issuance of Nationwide Permit 48 ("NWP 48") authorizing discharges, structures, and work in the waters of the United States related to commercial shellfish aquaculture activities. Plaintiffs argue that the Corps failed to comply with the Clean Water Act ("CWA"), the National Environmental Policy Act ("NEPA"), and the Endangered Species Act ("ESA") when it reissued NWP 48 in 2017. They request that the decision to adopt NWP 48 in Washington[1] be vacated under the Administrative Procedures Act ("APA") and that the Corps be required to comply with the environmental statutes before issuing any new permits or verifications for commercial shellfish aquaculture in this State.[2]

## BACKGROUND

The CWA authorizes the Army Corps of Engineers to issue permits for the discharge of dredged or fill material into the navigable waters of the United States. 33 U.S.C. § 1344(a). If the Corps determines that activities involving discharges of dredged or fill material "are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment," it may issue general permits on a state, regional or nationwide basis permitting the activities for a five year period. 33

---

[1] The Coalition to Protect Puget Sound Habitat seeks to bar the use of NWP 48 only in Puget Sound.

[2] The Court finds that one or more members of plaintiff Center for Food Safety has/have standing to pursue the CWA, NEPA, and ESA claims based on their concrete, particularized, and imminent injuries arising from activities in Washington that are permitted under the 2017 version of NWP 48.

ORDER HOLDING NWP 48 UNLAWFUL
IN THE STATE OF WASHINGTON AND
REQUESTING ADDITIONAL BRIEFING - 2

U.S.C. § 1344(e). "[T]he CWA imposes substantive restrictions on agency action" (Greater Yellowstone Coalition v. Flowers, 359 F.3d 1257, 1273 (10th Cir. 2004)): if "the effect of a general permit will be more than minimal, either individually or cumulatively, the Corps cannot issue the permit" (Wyoming Outdoor Council v. U.S. Army Corps of Eng'rs, 351 F. Supp. 2d 1232, 1255-57 (D. Wyo. 2005)). General permits often impose requirements and standards that govern the activities undertaken pursuant to the permit, but they relieve operators from the more burdensome process of obtaining an individual, project-based permit.

In 2017, the Corps reissued NWP 48, thereby authorizing "the installation of buoys, floats, racks, trays, nets, lines, tubes, containers, and other structures into navigable waters of the United States. This NWP also authorizes discharges of dredged or fill material into waters of the United States necessary for shellfish seeding, rearing, cultivating, transplanting, and harvesting activities." NWP003034. The nationwide permit authorizes(a) the cultivation of nonindigenous shellfish species as long as the species has previously been cultivated in the body of water at issue, (b) all shellfish operations affecting ½ acre or less of submerged aquatic vegetation, and (c) theall operations affecting more than ½ acre of submerged aquatic vegetation if the area had been used for commercial shellfish aquaculture activities at any point in the past 100 years. NWP003034-35.[3]

In addition to the CWA's requirement that the Corps make "minimal adverse effect" findings before issuing a general permit, "NEPA imposes procedural requirements on federal agencies to analyze the environmental impact of their proposals and actions." O'Reilly v. U.S.

_____

[3] The 100-year look back provision was not in the 2012 version of NWP 48.

ORDER HOLDING NWP 48 UNLAWFUL
IN THE STATE OF WASHINGTON AND
REQUESTING ADDITIONAL BRIEFING - 3

Army Corps of Engr's, 477 F.3d 225, 228 (5th Cir. 2007). Federal agencies are required to do an environmental assessment ("EA") of their proposed action, providing a brief discussion of the anticipated environmental impacts and enough evidence and analysis to justify a no-significant-impact determination. 40 C.F.R. § 1508.9. If the agency, after conducting an EA, is unable to state that the proposed action "will not have a significant effect on the human environment," a more detailed and comprehensive environmental impact statement ("EIS") must be prepared. 40 C.F.R. § 1508.11 and § 1508.13.[4]

The Corps' EA regarding the 2017 reissuance of NWP 48 is presented in a Decision Document dated December 21, 2016. NWP003034-3116. An additional condition was later imposed by the Seattle District through its Supplemental Decision Document dated March 19, 2017. COE 127485-611. The Court has considered both Decision Documents to the extent they reflect the Corps' analysis of the anticipated environmental impacts of issuing the nationwide permit and imposing the additional regional condition. The Decision Documents set forth the Corps' discussion of anticipated environmental impacts and the evidence and analysis justifying its determination "that the issuance of [NWP 48] will not have a significant impact on the quality of the human environment," making an EIS unnecessary under NEPA. NWP003106. The Decision Documents also reflect the Corps' determination that the "activities authorized by [NWP 48] will result in no more than minimal individual and cumulative adverse effects on the aquatic environment" for purposes of the CWA. NWP003107. The Seattle District, for its part, concluded that if it added a regional condition preventing the commercial harvest of clams by

---

[4] "Impact" and "effect" are used interchangeably in the regulations and are deemed synonymous. 40 C.F.R. § 1508.8.

ORDER HOLDING NWP 48 UNLAWFUL
IN THE STATE OF WASHINGTON AND
REQUESTING ADDITIONAL BRIEFING - 4

means of hydraulic escalator equipment and evaluated proposed activities as they were verified under the reissued permit, the effects of the permitted activities would be individually and cumulatively minimal. COE 127592-93.

Plaintiffs argue that these conclusions must be invalidated under the APA because the record does not support the Corps' conclusions regarding the environmental effects of individual shellfish aquaculture activities or their cumulative impacts and the EA does not accurately describe the anticipated environmental impacts of NWP 48 or otherwise justify a no-significant-impact determination. Under the APA, a reviewing court must set aside agency actions, findings, or conclusions that are "arbitrary, capricious, an abuse of discretion, [] otherwise not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A) and (D). Agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). Although agency predictions within the agency's area of expertise are entitled to the highest deference, they must nevertheless have a substantial basis in fact. Ctr. for Biological Diversity v. Zinke, 900 F.3d 1053, 1067 (9th Cir. 2018). In determining whether a decision is supported by substantial evidence in the record, the Court will not substitute its own judgment for that of the agency but rather considers whether the decision is based on relevant evidence that a reasonable mind might accept as adequate to support the agency's conclusion.

San Luis & Delta-Mendota Water Auth. v. Jewell, 747 F.3d 581, 601 (9th Cir. 2014).[5]

## DISCUSSION

Having reviewed the submissions of the parties and the administrative record, and having heard the arguments of counsel, the Court finds that there is insufficient evidence in the record to support the agency's conclusion that the reissuance of NWP 48 in 2017 would have minimal individual and cumulative adverse impacts on the aquatic environment for purposes of the CWA and that the Corps' environmental assessment does not satisfy NEPA's requirements. Although the minimal impacts finding is repeated throughout the Corps' Decision Document (see NWP003038, NWP003045-46, NWP003049, NWP003051, NWP003091, NWP003107), it is based on little more than (1) selectively chosen statements from the scientific literature, (2) the imposition of general conditions with which all activities under nationwide permits must comply, and (3) the hope that regional Corps districts will impose additional conditions and/or require applicants to obtain individual permits if necessary to ensure that the adverse impacts will be minimal. Each of these considerations is discussed below.

### (1) Effects Analysis

At various points in its analysis, the Corps acknowledges that commercial shellfish aquaculture activities can have adverse environmental impacts. See NWP003040 (commercial

---

[5] Plaintiffs also argue that the agency action should be invalidated because the Corps (a) failed to analyze a reasonable range of alternative actions in the EA, (b) failed to allow for meaningful public participation, and (c) failed to re-initiate consultation with expert wildlife agencies under the ESA when the 2017 version of NWP 48 was modified to increase the acreage on which commercial shellfish production was authorized, failed to incorporate assumed conservation measures and conditions, and failed to analyze the impacts of pesticides on endangered species. Because the Court finds that the Corps violated the CWA and NEPA, it has not considered these alternative theories for why NWP 48 should be invalidated.

ORDER HOLDING NWP 48 UNLAWFUL
IN THE STATE OF WASHINGTON AND
REQUESTING ADDITIONAL BRIEFING - 6

shellfish aquaculture activities "have some adverse effects on the biotic and abiotic components of coastal waters, including intertidal and subtidal areas"); Id. (noting that "at a small spacial scale (e.g., the site directly impacted by a specific aquaculture activity) there will be an adverse effect."); NWP003041 (acknowledging "some impacts on intertidal and subtidal habitats, fish, eelgrass, and birds"); NWP003042 (recognizing that "commercial shellfish aquaculture activities do have some adverse effects on eelgrass and other species that inhabit coastal waters"); COE 127559 (stating that "marine debris is a serious impact on the marine environment"); COE 127570 (acknowledging "potential adverse impacts" to riffle and pool complexes); COE 127584 (noting that "[c]ommercial shellfish aquaculture activities can result in conversion of substrates (e.g. mudflats to gravel bars), impacts to submerged aquatic vegetation, alteration in aquatic communities from native to non-native shellfish species, and water quality impacts from harvest activities"). It concludes that these impacts are no more than minimal, however, (a) when considered on a landscape rather than a site-by-site scale, (b) because the relevant ecosystems are resilient, and (c) because the impacts are "relatively mild" in comparison "to the disturbances and degradation caused by coastal development, pollution, and other human activities in coastal areas." NWP003040 and NWP003044.

(a) Scale of Impacts Evaluation

In determining the potential effects of a proposed discharge of dredged or fill material in an aquatic environment, the Corps is required to determine the nature and degree of the environmental impact the discharge will have, both individually and cumulatively. "Consideration shall be given to the effect at the proposed disposal site of potential changes in substrate characteristics and elevation, water or substrate chemistry, nutrients, currents,

ORDER HOLDING NWP 48 UNLAWFUL
IN THE STATE OF WASHINGTON AND
REQUESTING ADDITIONAL BRIEFING - 7

1  circulation, fluctuation, and salinity, on the recolonization and existence of indigenous aquatic

2  organisms or communities." 40 C.F.R. § 230.11(e) (emphasis added). Ignoring or diluting site-

3  specific, individual impacts by focusing solely on a cumulative, landscape-scale analysis is not

4  consistent with the governing regulations.

5

6          (b) Resilient Ecosystems

7          The Decision Document issued by Corps Headquarters acknowledges that "[t]he effects

8  of commercial shellfish aquaculture activities on the structure, dynamics, and functions of

9  marine and estuarine waters are complicated, and there has been much discussion in the

10  scientific literature on whether those effects are beneficial or adverse." NWP003040. Relying in

11  large part on a paper published by Dumbauld and McCoy for the U.S. Department of Agriculture

12  in 2015, the Corps concluded that the individual and cumulative impacts of the activities

13  authorized by NWP 48 would be minimal "because the disturbances caused by these activities

14  on intertidal and subtidal ecosystems are temporary and those ecosystems have demonstrated

15  their ability to recover from those temporary disturbances." NWP003045-46.[6]

16

17

18          [6] The Corps also cites a 2009 paper co-written by Dumbauld, which it describes as "a review of
   empirical evidence of the resilience of estuarine ecosystems and their recovery (including the recovery
19  of eelgrass) after disturbances caused by shellfish aquaculture activities." NWP003044. The Corps relies
   on the 2009 Dumbauld paper to support its conclusion that commercial shellfish production can have
20  beneficial impacts on some aspects of the aquatic environment. See NWP003406 ("Many species co-
   exist with commercial shellfish aquaculture activities and many species benefit from these activities.");
21  NWP003086 (noting improved water and habitat quality at moderate shellfish population densities);
   NWP003087 ("Activities authorized by this NWP may alter habitat characteristics of tidal waters. Some
22  species of aquatic organisms will benefit from those changes, while others will be adversely affected.");
   NWP003104 ("Sessile or slow-moving animals in the path of discharges of dredged or fill material and
23  aquaculture equipment may be destroyed. Some aquatic animals may be smothered by the placement of
   fill materials. Some aquatic organisms will inhabit the physical structure created by equipment used for
24  commercial shellfish aquaculture activities."). The fact that there are environmental winners and losers
25  when activities authorized under NWP 48 are undertaken does not resolve the issue of whether the

26

27  ORDER HOLDING NWP 48 UNLAWFUL
   IN THE STATE OF WASHINGTON AND
28  REQUESTING ADDITIONAL BRIEFING - 8

Dumbauld and McCoy's research cannot justify such a broad, sweeping conclusion regarding the resilience of entire ecosystems in both the intertidal and subtidal zones. According to the Corps' own summary of the paper, the authors evaluated only the effects of oyster aquaculture activities on submerged aquatic vegetation. NWP003044. The paper itself shows that Dumbauld and McCoy were studying the effects of intertidal oyster aquaculture on the seagrass *Zostera marina*. There is no discussion of the impacts on other types of aquatic vegetation, on the benthic community, on fish, on birds, on water quality/chemistry/structures, or on substrate characteristics. There is no discussion of the subtidal zone. There is no discussion regarding the impacts of plastic use in shellfish aquaculture and only a passing reference to a possible side effect of pesticide use. The Corps itself does not remedy these deficiencies: although it identifies various resources that will be adversely impacted by issuance of the national permit (along with resources that may benefit from shellfish production), it makes virtually no effort to characterize the nature or degree of those impacts. The Decision Document's "Impact Analysis" consists of little more than an assurance that district engineers will consider the direct and indirect effects caused by the permitted activity on a regional or case-by-case basis. NWP003073-74.

---

proposed agency action has more than minimal impacts or obviate the need for a "hard look" at all impacts, beneficial and adverse. Native Ecosys. Council v. U.S. Forest Serv., 428 F.3d 1233, 1238-39 (9th Cir. 2005). The 2009 review clearly shows, and the Corps acknowledges, that at least some aquatic species and characteristics are adversely affected by commercial shellfish aquaculture. The Ninth Circuit, faced with a similar situation under NEPA, noted that "even if we had some basis for assuming that [the agency's] implementation of the BiOp would have exclusively beneficial impacts on the environment, we would still lack a firm foundation for holding that [the agency] need not prepare an EA and, if necessary, an EIS." San Luis & Delta-Mendota Water Auth. v. Jewell, 747 F.3d 581, 652 n.52 (9th Cir. 2014).

ORDER HOLDING NWP 48 UNLAWFUL
IN THE STATE OF WASHINGTON AND
REQUESTING ADDITIONAL BRIEFING - 9

Under the CWA, the Corps must find that the proposed activity "will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment" before it issues a general permit. 33 U.S.C. § 1344(e). Under NEPA, the Corps is required to "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9(a)(1). The agency is required to take a "hard look" at the likely environmental impacts of the proposed action and prepare an EA to determine whether the impacts are significant enough to necessitate the preparation of an EIS. Native Ecosys. Council, 428 F.3d at 1238-39. The analysis, though brief, "must be more than perfunctory" and must be based on "some quantified or detailed information; . . . [g]eneral statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided." Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt., 387 F.3d 989, 993-94 (9th Cir. 2004) (alteration in original, citations omitted).

In this case, the Corps acknowledged that reissuance of NWP 48 would have foreseeable environmental impacts on the biotic and abiotic components of coastal waters, the intertidal and subtidal habitats of fish, eelgrass, and birds, the marine substrate, the balance between native and non-native species, pollution, and water quality, chemistry, and structure, but failed to describe, much less quantify, these consequences. The Corps cites the two Dumbauld papers for general statements regarding the positive or negative effects of shellfish aquaculture on certain aquatic resources or characteristics (focusing on seagrass), but it makes no attempt to quantify the effects or to support its conclusion that the effects are no more than minimal.

Even if the health and resilience of seagrass were the only concern - and, as discussed

ORDER HOLDING NWP 48 UNLAWFUL
IN THE STATE OF WASHINGTON AND
REQUESTING ADDITIONAL BRIEFING - 10

above, it is not - the 2015 Dumbauld and McCoy paper cannot reasonably be interpreted as evidence that seagrass is only minimally impacted by commercial shellfish aquaculture. As noted above, the paper evaluated only the effect of oyster aquaculture. In that context, it recognized the research suggesting that oyster aquaculture has direct impacts on native seagrasses at the site of the activity and in short temporal spans. These impacts are then ignored by both Dumbauld and the Corps in favor of a landscape, cumulative analysis which, as discussed above, is inadequate. Just as importantly, NWP 48 authorizes the discharge of dredged and fill material from not only oyster operations, but also from mussel, clam, and geoduck operations carried out on bottom substrate, in containers, and/or on rafts or floats. Thus, Dumbauld and McCoy did not evaluate, and drew no conclusions regarding, the impact that many of the activities authorized by NWP 48 would have on seagrass (much less other aquatic resources). The Seattle District, for its part, acknowledged the breadth of species and cultivation techniques that are encompassed in the phrase "commercial shellfish aquaculture." A draft cumulative impact assessment generated in February 2017 dedicated twenty-five pages to discussing the wide range of work and activities covered by NWP 48 and noting the species-dependent variability in cultivation techniques, gear, and timing. COE 125591-616.[7] These variations gave rise to a wide array of effects on the aquatic habitat (COE 125635-36), none of which is acknowledged or evaluated in the national Decision Document. In its Supplement, the Seattle District noted:

---

[7] The Corps acknowledges that the draft regional impact assessment "was a NEPA-level analysis," but faulted the author because that level of analysis should be performed by Headquarters for a nationwide permit. COE 125856. No comparable analysis is included in the national Decision Document, however.

ORDER HOLDING NWP 48 UNLAWFUL
IN THE STATE OF WASHINGTON AND
REQUESTING ADDITIONAL BRIEFING - 11

The impacts to eelgrass from aquaculture can be temporary, depending on the activity, because the habitat conditions themselves (elevation, water quality, etc.) are not permanently altered which allows eelgrass to eventually recover given sufficient time. In Washington State, the timeframe for recovery has been documented to be about 5 years depending on the activity and other factors. For example, when a geoduck farm is seeded it is covered with tubes and nets for 2 or more years and then the tubes and nets are removed until harvest, 3-5 years later. The eelgrass would have died back under the nets, had a chance to return when nets were removed, and then eelgrass is disturbed/removed again when harvest occurs. While this process allows for eelgrass return at the site, the frequency of disturbance and relatively long recovery times result in a local habitat condition where eelgrass more often than not is either not present or present at a much reduced functional state. This effect would persist as long as aquaculture is occurring at the site. In some cases, such as when nets are placed over planted clam beds, any eelgrass is likely to be permanently smothered and not recover. This is because of the permanence of the nets, which are only removed between harvest and the next planting cycle. The time between harvest and planting may only be a matter of weeks or months. Other impacts are discussed in the national decision document. This existing cycle of impacts to eelgrass represents the existing environment from aquaculture activities authorized under NWP [48] 2012; and these or similar effects may continue if verification under NWP 48 2017 is requested and received.

COE 127587-88.

Agency predictions within their areas of expertise are entitled to the highest deference, but they must have a substantial basis in fact. The Corps recognized that certain shellfish operations would displace eelgrass entirely for extended periods of time. In some cases, nets are used to smother the vegetation, precluding any chance of recovery. Where smothering nets are not in use, the eelgrass may recover to some extent, but was not likely to return to is full functional state before being disturbed and/or removed again for the next harvest or seeding

ORDER HOLDING NWP 48 UNLAWFUL
IN THE STATE OF WASHINGTON AND
REQUESTING ADDITIONAL BRIEFING - 12

activity. The impacts of commercial shellfish aquaculture on eelgrass (and presumably on all

species that rely on eelgrass) would continue as long as the permitted activity continued. Under

the 2017 version of NWP 48, a significant number of additional acres that were not cultivated

under the 2012 NWP could be put into shellfish aquaculture if the area had been commercially

productive during the past 100 years. See COE 118145-49; COE 127584. Any such "reopened"

beds could result in additional losses of seagrass and the benefits it provides. COE 127589

("[F]or many current operations, verification under NWP 2017 will create no appreciable change

to the baseline environmental conditions, and the impacts will be minimal both individually and

cumulatively.[8] For other operations, however, activities may create a change in current

conditions, for example if activities are proposed on land populated with recovered eelgrass.").

The national Decision Document does not quantify the periodic and permanent losses of

seagrass[9] or the impact on the wider aquatic environment. A reasonable mind reviewing the

---

[8] By quoting this portion of the Seattle District Supplement, the Court is not adopting its reasoning. National, regional, and state permits issued under the authority of the CWA last for only five years. When a NWP is reissued, the environmental impacts of the agency action logically include all activities conducted under the auspices of the permit, regardless of whether those operations are brand new or are simply "verified" as covered by the reissued NWP. The governing regulations expressly impose upon the Corps the obligation to consider the ongoing effects of past actions when conducting a cumulative impacts analysis. 40 C.F.R. § 1508.7. See Ohio Valley Envtl. Coalition v. Hurst, 604 F. Supp. 2d 860, 886-87 (S.D. W. Va. 2009) (rejecting the Corps' post hoc rationalization that past authorizations of moutaintop mining had no continuing effects and noting that, in the court's "common sense judgment," "[t]hese losses and impacts do not exist in a vacuum; they are not corrected or cured every five years with the renewal of a new nationwide permit. Nor do these accumulated harms become the baseline from which future impacts are measured. Before authorizing future activities with such tremendous impacts, the Corps must at least consider the present effects of past activities . . . .").

[9] The cumulative impacts of reissuing NWP 48 are to be analyzed in accordance with 40 C.F.R. § 230.7(b)(3), pursuant to which the Corps must predict "the number of activities expected to occur until the general permit expires." NWP003043. The Corps' estimates of how many acres are likely to be cultivated under the reissued national permit vary widely, however. The estimate provided in Section

ORDER HOLDING NWP 48 UNLAWFUL
IN THE STATE OF WASHINGTON AND
REQUESTING ADDITIONAL BRIEFING - 13

record as a whole would not accept Dumbauld and McCoy's limited findings regarding the

landscape-level impact of oyster cultivation on a species of seagrass in the intertidal zone as

support for the conclusion that entire ecosystems are resilient to the disturbances caused by

shellfish aquaculture or that the impacts of those operations were either individually or

cumulatively minimal.

(c) Impacts of Other Human Activity

Although the Corps does not rely on this line of reasoning in opposing plaintiffs' motions

for summary judgment, its Decision Document is replete with various forms of the following

statement: "[c]ommercial shellfish aquaculture activities are a minor subset of human activities

that affect coastal intertidal and subtidal habitats and contribute to cumulative effects to those

coastal habitats." NWP003041. See also NWP003040; NWP003042-44; NWP003061;

NWP003068; NWP003075-76; NWP003081; NWP003083-85. To the extent the Corps'

minimal impacts determination is based on some sort of comparison between the environmental

impacts of shellfish aquaculture and the environmental impacts of the rest of human activity (see

_____

7.2.2 of the Decision Document states that NWP 48 will be utilized 1,625 times over the five-year
period, resulting in impacts to approximately 56,250 acres of water. NWP003098. Those numbers are
reportedly based on past uses of the NWP plus an estimate of the number of activities that did not
require pre-construction notification and were not voluntarily reported to the Corps district. Id.
According to the Seattle District, however, over 56,000 acres of marine tidelands were permitted under
the 2012 version of NWP 48 in Washington State alone, and that number was only going to increase
under the 2017 version. COE 127590. Recognizing the long history of commercial shellfish operations
in the State's waters and the 100-year look back for identifying "existing" operations, the Seattle
District estimated that 72,300 acres of Washington tidelands could be authorized for commercial
shellfish production under the 2017 NWP 48. COE 127590-92. Thus, even if Headquarters had
attempted to quantify the proposed action's impacts on seagrass (or any other aquatic resource) before
reissuing NWP 48, its data regarding past uses of the permit was incorrect and its estimates of future
uses are suspect.

ORDER HOLDING NWP 48 UNLAWFUL
IN THE STATE OF WASHINGTON AND
REQUESTING ADDITIONAL BRIEFING - 14

NWP003046 (commercial shellfish aquaculture activities "cause far less change to the environmental baseline than the adverse effects caused by development activities, pollution, and changing hydrology that results from the people living and working in the watersheds that drain to coastal waters . . .."); NWP003078 ("[T]here are many categories of activities that contribute to cumulative effects to the human environment. The activities authorized by this NWP during the 5-year period it will be in effect will result in no more than minimal incremental contributions to the cumulative effects to these resource categories."); NWP003081 ("The activities authorized by this NWP will result in a minor incremental contribution to the cumulative effects to wetlands, streams, and other aquatic resources in the United States because, as discussed in this section, they are one category of many categories of activities that affect those aquatic resources.")), the analysis is inadequate. NEPA and the CWA were enacted because humans were adversely affecting the environment to a noticeable and detrimental extent. See 42 U.S.C. § 4331(a) (Congressional recognition of "the profound impact of man's activity on the interrelations of all components of the natural environment"); 33 U.S.C. § 1251(a) ("The objective of [the CWA] is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."). Noting that a particular environmental resource is degraded is not an excuse or justification for further degradation. The Corps must analyze the individual and cumulative impacts of the proposed activity against the environmental baseline, not as a percentage of the decades or centuries of degrading activities that came before.

The Corps makes a similarly untenable argument whenever the use of pesticides in a shellfish operation permitted under NWP 48 is discussed. While acknowledging that these substances are used and released into the environment during permitted activities, the Corps

ORDER HOLDING NWP 48 UNLAWFUL
IN THE STATE OF WASHINGTON AND
REQUESTING ADDITIONAL BRIEFING - 15

declines to consider the environmental impacts of pesticides because they are regulated by some

other entity. See NWP003077. Even if the Corps does not have jurisdiction to permit or prohibit

the use of pesticides, it is obligated to consider "other past, present, and reasonably foreseeable

future actions regardless of what agency (Federal or non-Federal) or person undertakes such

other actions." NWP003074 (quoting 40 C.F.R. § 1508.7). The Corps' decision to ignore the

foreseeable uses and impacts of pesticides in the activities it permitted on a nationwide basis

does not comport with the mandate of NEPA or with its obligations under the CWA. Having

eschewed any attempt to describe the uses of pesticides in commercial shellfish aquaculture or to

analyze their likely environmental impacts, the decision to permit such activities through NWP

48 cannot stand.

**(2) General Conditions of NWP 48**

In making its minimal impact determinations, the Corps relied in part on the general

conditions imposed on all nationwide permits. NWP003072. According to the Corps, the

prohibitions it has imposed against impacts on the life cycle movements of indigenous aquatic

species (general condition 2), spawning areas (general condition 3), migratory bird breeding

areas (general condition 4), concentrated shellfish beds (general condition 5), and endangered or

threatened species (general condition 18), and the requirements that permittees use non-toxic

materials (general condition 6) and confer with other regulatory agencies as needed (general

condition 19) will ensure that the individual and cumulative environmental effects of NWP 48

are minimal. Even if the Court were to assume that the general conditions will be universally

heeded, regulatory fiat does not satisfy NEPA's requirement that the EA contain "sufficient

evidence and analysis for determining whether to prepare an environmental impact statement or

ORDER HOLDING NWP 48 UNLAWFUL
IN THE STATE OF WASHINGTON AND
REQUESTING ADDITIONAL BRIEFING - 16

a finding of no significant impact." 40 C.F.R. § 1508.9(a)(1). The general conditions are just that: general. They apply to all NWPs and do not reflect a "hard look" at the environmental sequellae of commercial shellfish aquaculture. For purposes of the CWA, the general conditions on which the Corps relies do not necessarily prohibit substantial impacts: general condition 3, for example, precludes the most destructive of activities in spawning areas but leaves unregulated many activities that could significantly impact those areas. In addition, the general conditions relate to only some of the environmental resources the Corps acknowledges are impacted by the permitted activities and do not address the cumulative impacts of commercial shellfish aquaculture at all. 40 C.F.R. § 1508.7 ("Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.").

The Court does not intend to suggest, and is not suggesting, that the general terms and conditions imposed on a nationwide, regional, or state permit cannot be relevant to and supportive of a finding of minimal impacts. They are simply too general to be the primary "data" on which the agency relies when evaluating the impacts of the permitted activities.

### (3) Regional Conditions and District Engineers

Any permit authorizing activities on a nationwide level runs the risk of sanctioning activities that have more than minimal environmental impacts. In order to safeguard against that risk, regional district engineers have the discretionary authority to modify, suspend, or revoke the NWP within a particular region or class of waters, to add regional conditions to the NWP, to impose special conditions on a particular project, and/or to require an applicant to seek an individual permit. NWP003037 (citing 33 C.F.R. §§ 330.4(e) and 330.5). Although permittees may generally proceed with activities authorized by an NWP without notifying the district

ORDER HOLDING NWP 48 UNLAWFUL
IN THE STATE OF WASHINGTON AND
REQUESTING ADDITIONAL BRIEFING - 17

engineer, (33 C.F.R. § 330.1(e)(1)), general condition 18(c) requires the submission of a pre-construction notification ("PCN") if the proposed activity may affect or is in the vicinity of a species listed or habitat designated as critical under the ESA. Because all aquaculture operations in the State of Washington occur in waters where there are threatened/endangered species and/or critical habitat, applicants who seek to operate under the auspices of NWP 48 in this State must submit a PCN and obtain a "verification" that the activity falls within the terms of the permit and that the requirements of the ESA have been satisfied. COE 127592. "For a project to qualify for verification under a general permit, a Corps District Engineer must conclude that it complies with the general permit's conditions, will cause no more than minimal adverse effects on the environment, and will serve the public interest." Sierra Club v. U.S. Army Corps of Eng'rs, 803 F.3d 31, 39 (D.C. Cir. 2015) (citing 33 C.F.R. §§ 330.1(e)(2), 330.6(a)(3)(i)).

There is nothing arbitrary, capricious, or unlawful about having the regional district engineer review site-specific proposals to "cement [Headquarters'] determination that the projects it has authorized will have only minimal environmental impacts." Ohio Valley Envtl. Coalition v. Bulen, 429 F.3d 493, 501 (4th Cir. 2005). Tiering the review and decision-making tasks is permissible, but there must be a national decision document that actually evaluates the impacts of the proposed activity in light of any regional conditions imposed. The problems here are that the Corps' minimal impact determinations were entirely conclusory and the regional conditions that it assumed would minimize impacts were not in place at the time NWP 48 was adopted. The record is devoid of any indication that the Corps considered regional data, catalogued the species in and characteristics of the aquatic environments in which commercial shellfish aquaculture activities occur, considered the myriad techniques, equipment, and

ORDER HOLDING NWP 48 UNLAWFUL
IN THE STATE OF WASHINGTON AND
REQUESTING ADDITIONAL BRIEFING - 18

materials used in shellfish aquaculture, attempted to quantify the impacts the permitted activity would likely have on the identified species and characteristics, or evaluated the impacts of the as-yet-unknown regional conditions.

Faced with incredible diversity in both the environment and the activities permitted under NWP 48, the Corps effectively threw up its hands and turned the impact analyses over to the district engineers. The "Impact Analysis" section of the national Decision Document simply reiterates the district engineer's powers to revoke, modify, or condition the NWP and directs the district engineers to make minimal adverse environmental effects determinations after considering certain factors. NWP003073-74. Its "Cumulative Effects" analysis bluntly acknowledges that "[i]t is not practical or feasible to provide quantitative data" regarding the cumulative effects of NWP 48 other than the estimated number of times the permit will be used. NWP003081.

Because a nationwide analysis was impossible, the task of conducting a cumulative impacts analysis in specific watersheds was devolved to the district engineers. NWP003077. Even where adverse impacts are acknowledged, the Corps ignores its obligation to analyze and quantify them, instead relying on the district engineers to perform the analysis on a project-by-project basis. In the context of the public interest discussion regarding impacts to fish and wildlife, for example, the Corps recognizes that NWP 48 may "alter the habitat characteristics of tidal waters," that "[s]ome species of aquatic organisms will benefit from those changes, while other species will be adversely affected," and that equipment used in commercial shellfish operations may impede bird feeding activities and trap birds." NWP003087. It then states:

The pre-construction notification requirement[] provides the district engineer with

ORDER HOLDING NWP 48 UNLAWFUL
IN THE STATE OF WASHINGTON AND
REQUESTING ADDITIONAL BRIEFING - 19

an opportunity to review those activities and assess potential impacts on fish and wildlife values and ensure that the authorized activity results in no more than minimal adverse environmental effects.

Id. This abdication of responsibility is not authorized under the CWA or NEPA.[10]

As discussed in the preceding sections, Headquarters' prediction that the issuance of NWP 48 would have minimal individual and cumulative impacts on the environment, though repeatedly stated in the Decision Document, is not based on relevant evidence that a reasonable mind might accept as adequate to support the agency's conclusion, and the inclusion of general permit conditions does not obviate the need to analyze the impacts of proposed federal action. Thus, the Corps' impact analyses are based in large part on the hope that district engineers will mitigate any adverse environmental effects by revoking NWP 48, imposing regional or project-based conditions, and/or requiring an applicant to seek an individual permit. In this context, the Court finds that the Corps may not rely solely on post-issuance procedures to make its pre-issuance minimal impact determinations. See Bulen, 429 F.3d at 502 ("We would have substantial doubts about the Corps' ability to issue a nationwide permit that relied solely on post-

---

[10] The Corps' analysis with regards to plastic debris discharged into the marine environment is even more problematic. The Corps acknowledges the many public comments raising concerns about the introduction of plastics into the marine food web, but relies on the fact that "[d]ivision engineers can impose regional conditions to address the use of plastics" in response to these concerns. NWP003402. The Seattle District, for its part, declined to quantify the impact of plastics, instead noting that "it would not be a practicable solution to regionally condition NWP 48 to not allow the use of PVC and HDPE gear as there are no current practicable alternatives to use of the materials." COE 127559. The CWA requires the Corps to make minimal adverse effect findings before issuing a general permit. If, as appears to be the case with regards to the discharge of plastics from the permitted operations, the Corps is unable to make such a finding, a general permit cannot issue. The Corps has essentially acknowledged that it needs to individually evaluate the impacts of a particular operation, including the species grown, the cultivation techniques/gear used, and the specific location, before it can determine the extent of the impacts the operation will have.

issuance, case-by-case determinations of minimal impact, with no general pre-issuance determinations. In such a case, the Corps' 'determinations' would consist of little more than its own promise to obey the law.").

## CONCLUSION

A nationwide permit can be used to authorize activities involving the discharge of dredged or fill material only if the Corps makes a determination that the activity will have only minimal individual and cumulative adverse effects on the environment. In issuing NWP 48, the Corps has opted to interpret the "similar in nature" requirement of 33 U.S.C. § 1344(e)(1) broadly so that all commercial shellfish aquaculture activities in the United States could be addressed in a single nationwide permit. That choice has made assessing the impacts of disparate operations difficult: the Corps essentially acknowledges that the permitted activity is performed in such different ways and in such varying ecosystems that evaluating impacts on a nationwide level is nearly impossible. It tries to avoid its "statutory obligations to thoroughly examine the environmental impacts of permitted activities" by promising that the district engineers will do it. Hurst, 604 F. Supp. 2d at 901-02. The Court finds that the Corps has failed to adequately consider the impacts of commercial shellfish aquaculture activities authorized by NWP 48, that its conclusory findings of minimal individual and cumulative impacts are not supported by substantial evidence in the record, and that its EA does not satisfy the requirements of NEPA and the governing regulations.

For all of the foregoing reasons, plaintiffs' motions for summary judgment (Dkt. # 36 in C16-0950RSL and Dkt. # 31 in C17-1209RSL) are GRANTED and defendant's and intervenors' cross-motions (Dkt. # 44 and # 45 in C16-0950RSL and Dkt. # 43 and # 44 in C17-1209RSL)

ORDER HOLDING NWP 48 UNLAWFUL
IN THE STATE OF WASHINGTON AND
REQUESTING ADDITIONAL BRIEFING - 21

are DENIED. The Corps' issuance of a nationwide permit, at least with respect to activities in the waters of the State of Washington, was arbitrary and capricious and not in accordance with NEPA or the CWA. Pursuant to 5 U.S.C. § 706(2), the Court holds unlawful and sets aside NWP 48 insofar as it authorizes activities in Washington.

The only remaining issue is whether NWP 48 should be vacated outright to the extent it has been applied in Washington, thereby invalidating all existing verifications, or whether equity requires that the permit be left in place while the agency performs an adequate impact analysis and environmental assessment to correct its unlawful actions. Idaho Farm Bureau Fed'n v. Babbitt, 58 F.3d 1392, 1405 (9th Cir. 1995).

> Although not without exception, vacatur of an unlawful agency action normally accompanies a remand. Alsea Valley All. v. Dep't of Commerce, 358 F.3d 1181, 1185 (9th Cir. 2004). This is because "[o]rdinarily when a regulation is not promulgated in compliance with the APA, the regulation is invalid." Idaho Farm Bureau Fed'n[, 58 F.3d at 1405]. When equity demands, however, the regulation can be left in place while the agency reconsiders or replaces the action, or to give the agency time to follow the necessary procedures. See Humane Soc. of U.S. v. Locke, 626 F.3d 1040, 1053 n.7 (9th Cir. 2010); Idaho Farm Bureau Fed'n, 58 F.3d at 1405. A federal court "is not required to set aside every unlawful agency action," and the "decision to grant or deny injunctive or declaratory relief under APA is controlled by principles of equity." Nat'l Wildlife Fed'n v. Espy, 45 F.3d 1337, 1343 (9th Cir. 1995) (citations omitted).

All. for the Wild Rockies v. United States Forest Serv., 907 F.3d 1105, 1121 (9th Cir. 2018). Courts "leave an invalid rule in place only when equity demands that we do so." Pollinator Stewardship Council v. U.S. E.P.A., 806 F.3d 520, 532 (9th Cir. 2015) (internal quotation marks and citation omitted). When determining whether to leave an agency action in place on remand,

ORDER HOLDING NWP 48 UNLAWFUL
IN THE STATE OF WASHINGTON AND
REQUESTING ADDITIONAL BRIEFING - 22

we weigh the seriousness of the agency's errors against "the disruptive consequences of an interim change that may itself be changed." Cal. Cmties. Against Toxics v. U.S. E.P.A., 688 F.3d 989, 992 (9th Cir. 2012). In the context of environmental regulation, courts consider whether vacating the invalid rule would risk environmental harm and whether the agency could legitimately adopt the same rule on remand or whether the flaws were so fundamental that it is unlikely the same rule would result after further analysis. Pollinator Stewardship, 806 F.3d at 532.

Despite the fact that both plaintiffs clearly requested vacatur as the remedy for unlawful agency action, defendants provided very little evidence that would justify a departure from the presumptive relief in this APA action. The federal defendants state that additional briefing as to remedy should be permitted once the seriousness of the agency's error is determined. The intervenors assert that vacatur would cause disruption in the Washington shellfish farms and industry, including significant impacts to employees and the communities in which they live. Neither tact is compelling. The substantive defects in the agency's analysis when adopting the 2017 NWP are significant, the existing record suggests that adverse environmental impacts will arise if NWP 48 is not vacated, and, given the nature of the analytical defects and record evidence that seagrass is adversely impacted in the immediate vicinity of shellfish aquaculture, it seems unlikely that the same permit could issue following remand. As for the disruptive consequences to Washington businesses, employees, and communities, more information is required. As plaintiffs point out, shellfish growers can apply for individual permits (as they did before 2007). In addition, the Court has the equitable power to allow a period of time in which growers can avail themselves of that process before the existing verifications would be

ORDER HOLDING NWP 48 UNLAWFUL
IN THE STATE OF WASHINGTON AND
REQUESTING ADDITIONAL BRIEFING - 23

invalidated or to fashion some other equitable remedy to minimize both the risks of environmental harm and any disruptive consequences.

While the current record does not support deviation from the presumptive remedy for an APA violation, the Swinomish Indian Tribal Community has requested an opportunity to be heard regarding the scope of the remedy. C18-0598RSL (Dkt. # 28). Swinomish also challenge the Corps' minimal impacts analyses in reissuing NWP 48, but, unlike the plaintiffs in the above-captioned matters, does not seek vacatur of verifications or permits issued under the NWP. The Court will accept additional briefing regarding the appropriate remedy.

Because there is a presumption in favor of vacatur, defendants, intervenors, and Swinomish will be the moving parties and may file motions, not to exceed 15 pages, regarding the appropriate relief for the APA violations discussed above. Only one motion may be filed in each of the three cause numbers at issue, C16-0950RSL, C17-1209RSL, and C18-0598RSL. The motions, if any, shall be filed on or before October 30, 2019, and shall be noted for consideration on November 15, 2019. Plaintiffs' responses, if any, shall not exceed 15 pages. Replies shall not exceed 8 pages.

The Clerk of Court is directed to docket a copy of this order in Swinomish Indian Tribal Community v. Army Corps of Engineers, C18-0598RSL.

Dated this 10th day of October, 2019.

*Mvt S Lasnik*

Robert S. Lasnik
United States District Judge

ORDER HOLDING NWP 48 UNLAWFUL
IN THE STATE OF WASHINGTON AND
REQUESTING ADDITIONAL BRIEFING - 24